# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

**CIVIL ACTION — LAW**

**SANDEEP GOPALAN**
1201 Partridge Ln,
Winston Salem NC 27106

No. 2026-21916

Plaintiff

v.

**TNG CONSULTING, LLC**
also known as and doing business as
**THE NCHERM GROUP, LLC**
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania 19406
**LAUREN STARNES, J.D.**
c/o TNG Consulting, LLC
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania 19406
**ALISHA CARTER HARRIS**
c/o TNG Consulting, LLC
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania 19406
**JOSEPH E. VINCENT, M.L.S.**
c/o TNG Consulting, LLC
475 Allendale Road, Suite 200
King of Prussia, Pennsylvania 19406

Defendants

**JURY TRIAL DEMANDED**

Montgomery Co Prothonotary
SEP 22 '26 AM10:49

---

**NOTICE TO DEFEND**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without

further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

Lawyer Referral Service
Montgomery Bar Association
100 West Airy Street
Norristown, PA 19401
(610) 279-9660 ext. 201

**AVISO PARA DEFENDER**

Le han demandado a usted en la corte. Debe tomar acción dentro de los veinte (20) días posteriores a la notificación registrando su comparecencia por escrito y presentando defensas u objeciones. De lo contrario, el tribunal puede dictar sentencia en su contra y podría perder dinero, bienes u otros derechos importantes.

Debe llevar este papel a su abogado de inmediato. Si no tiene abogado, llame o diríjase a la oficina detallada a continuación para obtener información sobre cómo contratar uno o sobre servicios legales a costo reducido o gratuito.

Servicio de Referencia de Abogados
Asociación de Abogados de Montgomery
100 West Airy Street
Norristown, PA 19401
(610) 279-9660 ext. 201

---

**COMPLAINT**

Plaintiff Sandeep Gopalan, proceeding pro se, brings this action against Defendants TNG Consulting, LLC, and against Lauren Starnes, Alisha Carter Harris and Joseph E. Vincent individually, and in support avers as follows:

---

**I. THE PARTIES**



Montgomery Co Prothonotary
SEP 22 '26 AM10:49

1. Plaintiff Sandeep Gopalan, D.Phil., is an adult individual residing in North Carolina. He is a tenured Professor in the Department of Business, Management and Accounting at the University of Maryland Eastern Shore ("UMES"), where he has been employed since 2023.

2. Defendant TNG Consulting, LLC ("TNG"), also known as and doing business as The NCHERM Group, LLC, maintains its principal place of business at 475 Allendale Road, Suite 200, King of Prussia, Montgomery County, Pennsylvania 19406. TNG holds itself out as a national risk-management consulting firm serving educational institutions and offers external investigation services to institutional clients for a fee. TNG directs its correspondence, and the correspondence of the individual Defendants, from that address.

3. Defendant Lauren Starnes, J.D., is an adult individual employed by or engaged as a consultant to TNG. She is identified in the investigative report at issue in this action as the Investigator and as the person who compiled that report. Her residence address is presently unknown to Plaintiff and is stated care of TNG.

4. Defendant Alisha Carter Harris is an adult individual employed by or engaged as a consultant to TNG, holding the title Senior Supervising Consultant. She is identified in the sanctions memorandum at issue in this action as its author and as the Sanctions Decision-maker. Her residence address is presently unknown to Plaintiff and is stated care of TNG.

5. Defendant Joseph E. Vincent, M.L.S., is an adult individual employed by or engaged as a consultant to TNG, holding the title Partner and Vice President of Investigations, and subsequently Senior Supervising Consultant. He is identified as the author of the initial assessment of Plaintiff's own complaint described in Part I below. His residence address is presently unknown to Plaintiff and is stated care of TNG. Defendant Vincent is named in Counts IV, VI, VII, VIII and IX only.

6. Each of Defendants Starnes, Harris and Vincent is sued in her or his individual capacity. Plaintiff does not allege that any of them is liable by reason only of her or his employment or engagement by Defendant TNG, nor does Plaintiff seek to disregard TNG's corporate form. Plaintiff alleges that each personally committed, participated in and directed the tortious conduct complained of: Defendant Starnes personally conducted the fake investigation,

made the credibility determinations, authored the retaliatory Report and is named within it as the person who compiled it; Defendant Harris personally reviewed the record, authored the pretextual and retaliatory sanctions memorandum and is named within it as its author; and Defendant Vincent personally conducted and authored the assessment of Plaintiff's own complaint and is named within it as the person who submitted it.

7. An agent or employee is personally liable for a tort in which she or he personally participates, notwithstanding that the act was performed in the course of employment and notwithstanding that the employer may also be liable. Plaintiff pleads the liability of Defendants Starnes, Harris and Vincent on that basis.

---

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 42 Pa.C.S. § 931.

9. This Court has personal jurisdiction over Defendant TNG pursuant to 42 Pa.C.S. § 5301, TNG maintaining its principal place of business in this Commonwealth, and over the individual Defendants pursuant to 42 Pa.C.S. § 5322, the acts complained of having been directed from and transmitted through this Commonwealth.

10. Venue is proper in Montgomery County pursuant to Pa.R.C.P. 2179, TNG's principal place of business being located in this county, and the acts complained of having been directed from this county.

11. The amount in controversy exceeds the jurisdictional limit for compulsory arbitration in this county.

---

## III. FACTUAL BACKGROUND

### A. Plaintiff's position, his protected disclosures, and the circumstances existing when Defendants accepted the engagement

12. Plaintiff joined UMES in 2023 as a tenured Professor and administrator. In December 2023 he was awarded a multi-million dollar federal research award, among the largest individual awards in the institution's history. At the time of the events described below he had no prior disciplinary findings of any kind, was an exceptional performer, and received the maximum points possible in his two annual performance evaluations.

13. In June, September and December 2024, Plaintiff made whistleblower reports about fraud and serious organized misconduct by the President, Provost, and the head of the Office of Institutional Equity (OIE) of UMES to the University System of Maryland, the Governor of Maryland, to the Office of Inspector General, and to other agencies.

14. In December 2024, and again in 2025, Plaintiff made complaints concerning the head of OIE who is also the Assistant Vice President for Institutional Equity to the University System of Maryland, to UMES Human Resources, to the Office of the Attorney General of Maryland, and to federal agencies. That official is the person who oversaw the investigation of the underlying complaint against Plaintiff, who is recorded in the Report as Witness 3, and to whom the sanctions memorandum described below is addressed.

15. On July 28, 2025, Plaintiff commenced an action in the United States District Court against the President and the Provost of UMES. That action was pending on October 9, 2025, when UMES engaged Defendants. Plaintiff subsequently withdrew that action and commenced proceedings in the Circuit Court for Somerset County, Maryland in February 2026.

16. On or about September 22, 2025, Plaintiff submitted to the University System of Maryland a complaint alleging that the President of UMES had plagiarized her doctoral dissertation. The Chair of the Board of Regents acknowledged receipt of that complaint by email the same day. Allegations concerning that matter were thereafter the subject of national press reporting with side-by-side comparisons demonstrating egregious plagiarism.

17. Seventeen days later, on October 9, 2025, UMES issued to Plaintiff the Notice of Investigation described below, concerning a complaint that had been filed against him nearly eight months earlier and of which he had until then received no notice.

18. Defendant TNG holds itself out as a national firm specializing in the investigation of complaints at educational institutions. It delivers outcomes for those who pay it.

19. On information and belief, Defendants knew or ought reasonably to have known, before accepting the engagement, of the professional history of the official who commissioned them. That official – the abovenamed head of OIE, Mr. Jason Casares, resigned positions at another university in February 2016, including a deputy Title IX coordinator role, following a publicly reported allegation made against him of committing sexual assault. Plaintiff's belief is founded upon the reporting of those events within the trade press of the field in which Defendants operate, upon Defendants' own prominence within that field, and upon the professional obligation of an investigator to assess the circumstances of an engagement before accepting it. Plaintiff makes no averment as to the truth of that allegation and none is necessary to this claim.

20. Defendants accepted the engagement in those circumstances – in flagrant contempt of pending litigation by Plaintiff challenging every act of UMES – took the scope of work from that official who was a named respondent in litigation, and directed all of Plaintiff's questions to themselves rather than to any independent officer of the institution, with full knowledge he was a whistleblower alleging retaliation by the person who hired them.

**B. The engagement and its terms**

21. On October 9, 2025, the UMES Office of Institutional Equity and Compliance ("OIE") issued a Notice of Investigation letter to Plaintiff. The letter stated that a complaint had been received from a temporary worker on a 6-month contract that it was alleged Plaintiff had retaliated against her by making a report to U.S. Immigration and Customs Enforcement ("ICE"), and that "the University has engaged an external investigation firm (TNG Consulting) for resolution of these allegations of retaliation."

22. The same letter provided that UMES "considers TNG Consulting employees who perform these roles to be University officials who have a legitimate professional and/or educational interest in any records related to the formal resolution of the allegations referenced above," and that "external investigators, decision-makers, and advisors are given access to the records needed to investigate, support and/or resolve the allegations."

23. TNG was selected, retained, paid and instructed by UMES to retaliate. The report TNG produced states at page 4 that "A scope of work was determined by the University."

24. The engagement was made under a written TNG Services Agreement and an accompanying Statement of Work. On information and belief, the Agreement then in force was executed by TNG on September 5, 2025 and by UMES on September 17, 2025, some three weeks before the Notice of Investigation issued to Plaintiff, and was executed for UMES by its Acting Director of Procurement.

25. On information and belief, the Statement of Work provided a prepaid package of $50,000 to be drawn down against hourly rates, including $400 per hour for investigation by a consultant and $525 per hour for partner review, and provided that UMES should not be entitled to any credit or refund for unused services. Plaintiff will identify the terms applicable to his matter upon discovery.

26. On information and belief, the Agreement was one of a continuous series. UMES had retained TNG under agreements executed in October 2023 and August 2024, and executed a further Statement of Work for an additional $50,000 in July 2026, the month in which Defendant Vincent's assessment of Plaintiff's own complaint issued.

27. **The Agreement disclaims the very status UMES asserted.** On information and belief, Section 3 of the Agreement, headed "Nature of Relationship," provides that TNG and any of its subcontractors, affiliates or assigns shall retain sole and exclusive control over the method and manner in which the Services are performed, and that TNG is not and will not be an agent or employee of UMES.

28. That term is irreconcilable with the Notice of Investigation letter of October 9, 2025, which asserts that UMES "considers TNG Consulting employees who perform these roles to be University officials." Defendants contracted on terms declaring that they were not agents or employees of the institution, and then accepted and acted upon a designation asserting that they were its officials. Plaintiff pleads the term as establishing that Defendants were at all material times third parties to his employment relationship with UMES, as establishing that the designation on which any claim of privilege or authority might rest

was made contrary to Defendants' own contract, and that Defendants knew they could not be Maryland state personnel when they were independent contractors.

29. Read with the Report's statement that "A scope of work was determined by the University," the position is this: UMES determined what would be investigated; Defendants alone determined how it would be investigated, and Defendants alone determined what would be found. Neither may attribute to the other the conduct complained of in this action.

30. On information and belief, Section 11.1 of the Agreement provides that it is not a contract for legal services, regardless of whether Services are provided by a TNG consultant who is a licensed attorney, and that TNG is not providing legal advice or acting in the capacity of legal counsel in any way.

31. On information and belief, Section 11.5 of the Agreement provides that UMES shall indemnify, defend and hold harmless TNG and its members, partners, consultants and investigators, in their personal and professional capacities, from any claim in any way arising out of the subject matter of the Agreement, and that TNG may at its election tender its defense to UMES at UMES's expense; and the Statement of Work provides that UMES shall compensate TNG at its prevailing hourly rates for time its employees spend defending their work in any legal proceeding, including responding to an agency investigation or a deposition, except to the extent the proceeding arises from the actions or omissions of TNG itself.

32. Plaintiff pleads those terms as evidence that Defendants and the institution had aligned their interests in the outcome of any challenge to Defendants' work before the work was done, and that Defendants had a financial incentive to characterize their conduct as directed by UMES rather than as their own.

33. The complaint TNG was engaged to investigate had been filed on February 14, 2025. No notice of any investigation into it was given to Plaintiff for approximately eight months. During that interval Plaintiff's appeal in a separate matter was determined against him in brazen violation of due process on July 25, 2025, and he was demoted on July 27, 2025, without his having been informed that a further complaint was pending against him.

34. The Notice of Investigation letter did not identify the specific policy provision alleged to have been violated, did not attach or summarize the complaint, did not describe the evidence, did not state the standard of proof, did not set out the procedural steps or any timeline, and did not advise Plaintiff of any right to an advisor. It directed him instead to "reach out to the TNG investigator if you have any questions or concerns."

**C. Defendants' representations of impartiality, and Plaintiff's initial participation**

35. By letter dated October 28, 2025, transmitted from TNG's King of Prussia address, TNG requested Plaintiff's attendance at an investigative interview, offered three dates, advised him that he was permitted to consult an advisor or attorney, and instructed him to bring any materials or evidence he considered important.

36. That letter represented that the process was one in which Plaintiff was "protected from retaliation," and held out the investigation as a regular institutional proceeding conducted according to policy. The letter directed any concern about retaliation, and any request for accommodation, to the same official described at paragraphs 12 and 17 above.

37. In reliance upon those representations, Plaintiff responded on October 31, 2025, accepted a date, and attended a meeting with Defendant Starnes on November 12, 2025.

38. Defendants represented in the report they subsequently produced, at page 4, lines 34 through 37, that "Respondent was afforded the presumption that the applicable UMES policies were not violated unless and until the preponderance of the evidence showed that they were," and that "Investigator Starnes does not hold any biases for or against complainants or respondents generally, or for or against this Complainant or Respondent, specifically."

39. Defendants further represented that TNG had been contracted "to conduct a prompt, thorough, reliable, and impartial investigation."

**D. The requests for evidence and for cross-examination, and their refusal**

40. On December 1, 2025, Plaintiff wrote to Defendant Starnes and to TNG requesting, among other things, the recording and transcript of the November 12, 2025 meeting and the terms of TNG's engagement by UMES. The report acknowledges this communication at page 8.

41. On February 9, 2026, TNG transmitted a preliminary investigation report to Plaintiff and afforded him three (3) business days to respond.

42. On February 12, 2026, within the period allowed, Plaintiff submitted a written response. In it he demanded, among other things, production of "[a]ll 'evidence' collected in this investigation for my examination and response," the originals of every document relied upon, and "[a]n opportunity to cross-examine the complainant and all alleged witnesses," requesting "the dates and times for each of the witnesses and the complainant."

43. No evidence file was produced to Plaintiff. No witness transcript was produced to Plaintiff. No opportunity to question any witness, orally or in writing, was afforded to Plaintiff at any stage. Defendants were brazen in their violations of due process.

44. The appeal decision subsequently issued in the matter records the refusals rather than disputing them. It states that "[t]he Procedures do not specify any method other than the investigation report as the method to provide the parties with access to review the evidence an Investigator has gathered," and that "[t]he Procedures contain no provision for cross-examination of witnesses nor any specific 'due process rights' associated with cross-examining witnesses."

45. Plaintiff's requests for evidence and for the opportunity to test the accounts of adverse witnesses are therefore not in dispute. What is in dispute is Defendants' decision to make findings of credibility, and to publish them, without affording either.

46. Defendants afforded Plaintiff three (3) business days to respond to a thirty-two page preliminary report, and five (5) business days to appeal a thirty-two page final report together with a six page sanctions memorandum recommending that termination proceedings be considered. Defendants had themselves taken from October 20, 2025 to February 26, 2026 to produce the report to which Plaintiff was allowed three days to respond.

47. In transmitting the final report and the sanctions memorandum on April 23, 2026, Defendants directed that "the details of this investigation, including any recommended sanction(s),

shall remain confidential." Defendants thereby purported to restrict Plaintiff's use of the very documents by which his professional standing was to be determined.

48. Defendants further required that any appeal be submitted to Defendant TNG itself, declined to identify the person who would determine the appeal, and did not do so until May 21, 2026 – after the appeal was filed. TNG, the author of the findings under appeal, thus controlled the channel through which the appeal was made, the timing of its transmission, and the disclosure of the identity of the person who would decide it.

**E. The Report and the statements complained of**

49. In February 2026 Defendant Starnes issued a document titled *Final Investigation Report and Findings, University of Maryland Eastern Shore*, running to thirty-two pages together with appendices (the "Report").

50. The Report found Plaintiff responsible for violating the UMES Policy Prohibiting Discrimination and the State of Maryland Policy on Sexual Harassment in the Workplace.

51. The statements of and concerning Plaintiff of which he complains include, without limitation, the following:

(a) that Plaintiff retaliated against a complainant for having engaged in protected activity;

(b) that Plaintiff subjected a complainant to an adverse action for the purpose of intimidating her and interfering with an institutional proceeding;

(c) that Plaintiff's stated reasons for his conduct were "pretextual rather than legitimate";

(d) that Plaintiff was "less credible than Complainant";

(e) that Plaintiff's assertions concerning the complainant's timekeeping and performance lacked any corroboration and that this "diminishe[d] Respondent's credibility";

(f) that Plaintiff's conduct constituted "a willful neglect of that duty";

(g) that "the record contains no evidence that Respondent attempted" to raise his concerns through appropriate internal university channels; and

(h) that Plaintiff's conduct warranted formal consideration of termination for cause.

52. Each of the foregoing statements is false. Each was published by Defendants in documents of their own authorship. Each is capable of defamatory meaning, imputing to Plaintiff dishonesty, bad faith and serious misconduct in his profession.

**F. The findings rest on causal elements Defendants admitted they could not establish**

53. The Report sets out, at page 26, the three elements Defendants themselves identified as necessary to a finding of retaliation: that the complainant engaged in a protected activity; that she was subjected to an adverse action by Plaintiff; and that Plaintiff engaged in the adverse action **because** she engaged in a protected activity. The Report states in terms: "When the answer to the three ultimate questions is 'yes,' the Policy is violated, but when the answer to any one of the three questions is 'no,' a policy violation cannot be sustained." Each element was disputed and no evidence was provided.

54. The third element turned entirely upon when Plaintiff was alleged to have made the report to ICE, because Defendants' sole theory of causation was temporal proximity.

55. Defendants admitted in the Report that they could not establish that fact. At page 29, lines 25 to 26, they wrote: "although there is no direct evidence of exactly when Respondent reported Complainant to ICE." At page 30, lines 1 to 2, they wrote that the record "is silent as to when exactly Respondent reported Complainant to ICE, **presumably** Respondent reported Complainant to ICE not long before ICE agents visited UMES's campus looking for Complainant" (emphasis added).

56. Defendants nonetheless sustained the element and published the finding without a shred of evidence. Note that they provided no evidence of *what* Plaintiff allegedly reported – essential for any adverse action determination.

57. The two sentences stand together in the same document. At page 26 Defendants wrote that "when the answer to any one of the three questions is 'no,' a policy violation cannot be

sustained." At page 30 they wrote that the record "is silent as to when exactly Respondent reported Complainant to ICE, presumably Respondent reported Complainant to ICE not long before ICE agents visited." Having stated the rule that a violation cannot be sustained where an element is unanswered, Defendants answered the element by presumption – **with absolutely no evidence** – and sustained the violation.

58. Nothing in the Policy permits a finding to rest upon a presumption. The Policy provides that the standard is whether "there is evidence to indicate a policy violation is 'more likely than not,'" and that "Investigations are conducted to take into account the totality of all evidence available, from all relevant sources." **Defendants recorded that the evidence on the decisive questions did not exist, and supplied its absence with an assumption of their own.**

59. Defendant Harris, reviewing the same record, likewise recorded that "the investigation was unable to determine the exact statements Respondent made to ICE when he reported Complainant," and recommended that termination for cause be formally considered notwithstanding.

60. Defendants listed "Homeland Security Investigations" among the sources in their own Evidence List at page 8 of the Report. No record from that agency, and no record from any federal agency, establishing the date or content of any report is identified anywhere in the Report.

61. A witness whose testimony Defendants credited stated that she "was not aware of any evidence regarding whether Respondent submitted his report to ICE prior to December 6, 2024" — the date on which Plaintiff first received notice of the underlying complaint. Defendants recorded that testimony and did not pursue the question.

62. Defendants therefore published a finding on the only contested element of the offense they had themselves defined, having recorded in the same document that the evidence for it did not exist.

**G. The conduct investigated was on its face lawful, and Defendants inverted the question**

63. The act Defendants were engaged to investigate was the making of a report to a federal law enforcement agency concerning suspected violations of federal law.

64. The making of such a report is, on its face, a lawful act. A person who reports a suspected violation of federal law to the agency charged with enforcing it requires no authority to do so, no office, no supervisory relationship and no professional obligation. The right to communicate with government concerning suspected unlawful conduct is among the oldest and most firmly established of civil rights.

65. Defendants' own stated methodology, applied by them elsewhere in this same institution, requires a facial assessment before an investigation proceeds. Defendant Vincent's assessment of Plaintiff's own complaint records that it "evaluated the complaint on its face and presumed the facts as alleged by Gopalan were true to determine whether there is sufficient information to warrant proceeding with an investigation." The Policy likewise provides that "[u]pon receiving an initial report or complaint, OIE will assess whether an Investigation is justified."

66. Taken on its face, the allegation against Plaintiff described lawful conduct. To convert it into a policy violation, Defendants had to assume that the report had been made for an improper purpose. That assumption was not the product of the investigation; it was its premise.

67. Plaintiff raised the point in writing on October 13, 2025, before any investigative step had been taken, stating that any report "is protected by the First Amendment to the US Constitution and federal laws." There was no evidence offered that he made a report.

68. The Report reproduces, at page 5, the Policy's provision that "[t]he following actions do not constitute Discrimination under this Policy: i. Complying with federal, state, or local laws and regulations." Defendants quoted that provision and never applied it to the conduct before them.

69. Defendants' entire treatment of the point appears at page 31 of the Report, in one sentence: "Pretextual efforts to retaliate are unlikely to be protected as Free Speech under the First Amendment." That sentence is not a finding. It is expressed as a likelihood, and it assumes the pretext it is offered to establish.

70. Defendants then reasoned from the absence of a duty to the absence of a right. The Report states, at page 31: "Further, at the time Respondent reported Complainant to ICE, Respondent was on administrative leave, and no longer Complainant's supervisor. As such, there is no evidence that Respondent was under a professional obligation to report Complainant to ICE." That a person is under no obligation to report a suspected violation of federal law does not render his report unlawful, improper, or unprotected. Defendants treated the absence of a duty as though it established the absence of a legitimate reason.

71. Defendant Harris carried the same inversion further, writing: "Under these circumstances, the record does not demonstrate any legitimate or **necessary** reason for Respondent to contact ICE regarding Complainant after he had been removed from his supervisory role." Necessity is not the measure of a citizen's communication with a law enforcement agency. Defendant Harris required Plaintiff to justify the making of a lawful report, and treated his failure to satisfy her of its necessity as a ground for recommending that his tenure be considered for revocation.

72. The findings Defendants made on this point are the findings that establish the protection they denied. It is settled that speech made by a public employee pursuant to his official duties is not made in his capacity as a citizen, and that speech made otherwise than pursuant to official duties is. The threshold question is therefore whether the employee spoke as an employee or as a citizen.

73. Defendant Starnes answered that question. She found that "at the time Respondent reported Complainant to ICE, Respondent was on administrative leave, and no longer Complainant's supervisor," and that accordingly "there is no evidence that Respondent was under a professional obligation to report Complainant to ICE."

74. Defendant Harris answered it independently and in the same terms. She found that Plaintiff "was placed on administrative leave on December 6, 2024, and therefore no longer exercised supervisory authority over Complainant or responsibility for monitoring her work, funding, or timekeeping," and that "[a]s a result, Respondent had no operational or supervisory obligation to report alleged misconduct related to Complainant's employment."

75. Each Defendant thus determined, on the record before her, that Plaintiff's communication with the federal agency lay wholly outside his employment duties. Each then reasoned from that determination to the opposite of the conclusion it supports: that because Plaintiff owed no duty to report, he had no legitimate reason to report, and his having reported was therefore evidence of an improper purpose.

76. Reduced to its terms, Defendants' reasoning is that Plaintiff had no obligation to speak and therefore no entitlement to speak. Plaintiff avers that no impartial investigator, and no firm holding itself out as a national specialist in the conduct of investigations at educational institutions, could have made the findings recorded at paragraphs 64 and 65 and drawn from them the inference Defendants drew, and that the inference is evidence that the retaliatory outcome preceded the analysis and was for an unlawful purpose.

77. Plaintiff avers that no impartial investigator would have proceeded from a facially lawful act to a finding of responsibility without addressing whether the act was protected, and that Defendants' failure to do so — while reproducing in their own Report the policy provision and the constitutional assertion that required it — is evidence that the impartiality they represented was not provided, and that the outcome was determined before the analysis was written and made for retaliatory purposes to silence a whistleblower.

**H. The exculpatory witness identified in writing, and never contacted**

78. Dr. Chi-Fang Tsai was at the material time the administrative director of the unit in which the complainant worked and her immediate supervisor. She was in a position to speak directly to the complainant's attendance, work product and timekeeping, and to the frequency and circumstances of Plaintiff's interactions with her.

79. On December 11, 2024, Dr. Tsai wrote to an OIE investigator stating that she was the only person who worked with the complainant, that she coordinated all communications between her and Plaintiff, that they had met in person on six occasions, all in public areas, together with one virtual meeting, that she arranged all of those meetings and was present as an eyewitness on every occasion, and that OIE had never contacted him.

80. On December 12, 2024, Plaintiff's then counsel wrote to UMES naming Dr. Tsai as the witness who had attended every meeting with the complainant.

81. Dr. Tsai was never interviewed in the investigation that produced the June 2, 2025 findings.

82. Dr. Tsai was never interviewed by Defendant Starnes. She does not appear in the Evidence List at pages 6 through 8 of the Report. She does not appear anywhere in the Report. The Report offers no explanation for her absence.

83. Defendants nonetheless wrote, at page 25 of the Report, that Plaintiff's account was uncorroborated, and that "there is no other available evidence to corroborate this information, which diminishes Respondent's credibility."

84. The corroboration was available. It had been identified to the institution in writing, by the witness himself and by counsel, thirteen months before Defendant Starnes began her work. Defendants declined to obtain it and then published the absence of it as a reason to disbelieve Plaintiff.

85. Plaintiff has since obtained a sworn affidavit from Dr. Tsai.

**I. The statement contradicted by Defendants' own evidence file**

86. Defendant Harris wrote, in the sanctions memorandum dated April 23, 2026, that "Any such concerns, had they existed, could have been raised through appropriate internal university channels prior to his removal from supervisory duties. The record contains no evidence that Respondent attempted to do so."

87. That statement is contradicted by the record Defendant Harris reviewed.

88. The Report Defendant Harris reviewed contains the interview testimony of the UMES Assistant Vice President for Institutional Equity, Diversity, and Compliance, who was present at the December 6, 2024 meeting at which Plaintiff first received notice of the complaint. That official stated, of that meeting: "I believe one of the things he mentioned was something about time sheet fraud, and that's one of the things we did check into, reporting that, and we didn't find anything reported to HR."

89. The same official is recorded as having asked the UMES Director of Human Resources, on March 27, 2025, whether Plaintiff had filed complaints regarding timesheet fraud "prior to December 6, 2024." The inquiry was framed so as to exclude the date on which the official's own testimony placed Plaintiff's report to him.

90. Plaintiff was placed on administrative leave on December 6, 2024 — the same day. The supervisory channel Defendant Harris faults him for not using was closed by the institution on the day he is recorded as having used it.

91. Defendant Harris relied upon the absence she had asserted in escalating the recommended sanction. Her memorandum states that "[t]he absence of any contemporaneous reports or documented concerns undermines Respondent's assertion that his report to ICE was motivated by legitimate compliance concerns rather than in response to Complainant's protected activity."

**J. Further facts evidencing malice and reckless disregard for truth**

92. **The timesheets examined do not cover the period at issue.** The Report states at page 25 that Defendant Starnes examined the complainant's timesheets and found them generally consistent with her account. The timesheets examined are identified at page 24 as covering 08/24/2024 through 10/20/2024. The concerns Plaintiff had raised, and the contemporaneous email exchange the Report itself reproduces, concern November 2024. Defendants drew a conclusion about a period they had not examined. Moreover, it is illogical to conclude anything by looking at a timesheet when the allegation is that the timesheet submitted is fraudulent.

93. **The adverse-action finding rests on a hypothetical Defendants constructed.** The Report recites at page 27 that "[a]n adverse employment action must be substantial enough to have materially disadvantaged an employee." It then finds adverse action on the basis, at page 28, that "it is plausible that if ICE agents had approached Complainant on that day and Complainant had not had her employment documents on her person, ICE could have detained Complainant. Had this occurred, Complainant's employment certainly would have been adversely affected." The complainant did not encounter the agents. Defendants

supplied a counterfactual and then reasoned from it as though it had occurred. Defendants punished Plaintiff based on a fiction that they admitted in their own words.

94. **Defendants solicited and recorded opinion testimony on the ultimate issue.** A witness was asked, and Defendants recorded, that "in her opinion, Respondent would not have reported Complainant to ICE had Complainant not filed the Initial Complaint." The witness had no personal knowledge of the matter. Defendants sought her conclusion on the very question they were engaged to determine.

95. **The attribution rests on a hedged, third-hand account.** The only person who spoke to the federal agents was the UMES General Counsel. His recorded account is that the agents "proceeded to tell me that they had had a complaint or some sort of, I don't think they used word complaint, maybe a report or something from [Respondent]." He further recorded that the agents told him, "We are doing a lot of visits around this time." He stated that it was "his assumption" that the report was connected to the complaint. Defendants treated an assumption as corroboration.

96. **Defendants credited as neutral witnesses persons with a direct interest in the outcome.** Three of the four witnesses Defendants interviewed were the OIE officials whose own prior investigation of Plaintiff was the subject of his appeal and of pending litigation in which they were named. The fourth was the institution's General Counsel, likewise a named party in litigation brought by Plaintiff. The Report's credibility section, at pages 25 to 26, describes each as "generally credible" and identifies no interest, conflict or stake on the part of any of them. Defendants knew these witnesses had ulterior motives.

97. **Defendants disclaimed drawing an adverse inference and then drew one.** The Report states at page 25 that "[t]he Investigator drew no negative inference solely from Respondent's decision not to participate in the investigation." The same paragraph continues that "there is certain evidence which is squarely within Respondent's possession . . . which cannot be obtained without Respondent's participation," and concludes: "This limits the persuasiveness of the limited evidence provided by Respondent."

98. **The constitutional defense Plaintiff had raised received one sentence.** Plaintiff asserted in writing, on October 13, 2025, that any communication with a federal law enforcement agency was protected. The Report disposes of the assertion, at page 31, in a single sentence: "Pretextual efforts to retaliate are unlikely to be protected as Free Speech under the First Amendment." The sentence assumes the conclusion it is offered to support.

99. **Defendants sustained a finding under a second policy without separate analysis.** Having found a violation of the UMES Policy Prohibiting Discrimination, Defendants added, at page 31, a finding under the State of Maryland Policy on Sexual Harassment in the Workplace on the stated basis that it is "an overlapping policy." No separate element was identified and no separate analysis was performed.

100. **The Report contains errors indicating the absence of care.** The causation timeline at page 29 dates Plaintiff's receipt of notice of the underlying complaint to "December 6, 2025," a year after the event on which the entire temporal inference depends. Footnote 8 at page 7 contains a sentence that reads, in its entirety, that a party's response "is included because Complainant's response is included."

**K. The escalation to a termination recommendation**

101. On February 26, 2026, Defendant Harris was assigned to review the Report and recommend sanctions.

102. Defendant Harris found that "the record reflects that Respondent's conduct occurred on one occasion."

103. Defendant Harris found that "there is no indication of prior disciplinary findings or complaints during his service at UMES prior to Complainant's complaints," and that "[t]his clean record appropriately serves as a mitigating factor in determining sanctions."

104. Having found a single occasion and a clean record, Defendant Harris recommended that Plaintiff be suspended and that "termination for cause be formally considered under the procedures established in University System of Maryland II-1.00 Policy on Appointment,

Rank, and Tenure of Faculty." Her memorandum does not explain what effect the mitigation she had identified was given.

105. Defendant Harris escalated the recommendation by importing the findings of the earlier, separate investigation as aggravating context, writing that "when reviewing the totality of the circumstances, the record reflects that Respondent subjected Complainant to a series of unwelcome behaviors on the basis of Complainant's sex, for which he was disciplined as outlined above."

106. Those earlier findings had been separately sanctioned in June 2025 and were, at the time Defendant Harris wrote, the subject of pending litigation in the Circuit Court for Somerset County, Maryland. The appeal officer in the retaliation matter subsequently declined to reconsider them on timeliness grounds. They were thus unreviewable within the institutional process and fully available for use against Plaintiff within it.

107. Defendant Harris further invoked a civility provision of the UMES Faculty Handbook requiring faculty to "foster a campus climate that is respectful and civil" and to refrain from conduct that would "intentionally disparage or defame others," and characterized Plaintiff's conduct as "a willful neglect of that duty." Willful neglect of duty denotes a failure to perform what a position requires. The conduct found was an affirmative act.

108. Defendant Harris understood, and her memorandum states, that the purpose of her document was to "ensure that the matter is advanced into the established faculty and administrative review processes." She knew that the findings she was passing forward would be used to seek the termination of a tenured appointment despite being manifestly unqualified and lacking lawful authority for such an act.

109. The earlier findings Defendant Harris imported as aggravating context had already been separately and completely sanctioned in June 2025 by removal from two leadership roles, a letter of reprimand and four assigned trainings. They were, at the time she wrote, the subject of pending proceedings in the Circuit Court for Somerset County, Maryland, and the appeal officer in the present matter subsequently declined to reconsider them on

timeliness grounds. They were thus at once unreviewable within the institutional process and fully available for use within it.

110. It is a recognized principle of employment discipline, and one which Defendants hold themselves out as expert in applying, that prior discipline may be weighed in aggravation only where it is a matter of record, the employee was notified of it in writing, and the employee was afforded a genuine opportunity to contest it before a higher authority. Defendant Harris weighed findings that Plaintiff was then contesting in a court of law and that the institution's own appeal officer would decline to revisit.

111. Defendant Harris identified mitigation and then gave no account of its effect. She found that the conduct "occurred on one occasion" and that Plaintiff's clean prior record "appropriately serves as a mitigating factor in determining sanctions." She then recommended the most serious course available to her. Her memorandum does not state what weight the mitigation received, or why a single occasion by a respondent of unblemished record warranted the referral she made.

**L. Notice to Defendants that the underlying findings were before a court**

112. Plaintiff informed Defendants in writing, on more than one occasion and beginning no later than December 1, 2025, that the factual matters on which the investigation depended — including the complainant's timekeeping and the circumstances of the underlying complaint — were the subject of pending proceedings in the Circuit Court for Somerset County, Maryland.

113. Plaintiff repeated that notice in his written response of February 12, 2026, addressed to Defendant TNG's principals as well as to Defendant Starnes.

114. Defendants proceeded to findings on those same contested facts. They did not seek the discovery available in those proceedings, did not await their outcome, and did not obtain the testimony of the identified witness whose account bore directly upon them.

**M. Defendants applied one standard to Plaintiff as respondent and another to Plaintiff as complainant**

115. On September 16, 2025, and by supplement on September 18, 2025, Plaintiff filed a complaint with a UMES Dean alleging that his department chair had engaged in bullying, harassment and stalking conduct, including by waiting outside his classrooms on five identified occasions between August 26 and September 16, 2025, on one of which a student in his class observed her through the glass of the classroom door.

116. Plaintiff heard nothing for many months.

117. Abruptly, Defendant Vincent issued a report on July 29, 2026 — more than ten months after the complaint was filed – claiming to have "assessed" it.

118. Defendant Vincent did not interview Plaintiff, the complainant in that matter, at any time.

119. Defendant Vincent did not interview the Dean to whom the complaint had been made, who was the department chair's own supervisor.

120. Defendant Vincent did not interview the department chair.

121. Defendant Vincent did solicit and record information from the UMES General Counsel, on February 6, 2026, and from the UMES Provost, on February 19, 2026. Both were individuals whom Plaintiff had identified in complaints and proceedings of his own. Both consultations occurred in the same period in which Defendant Starnes was finalizing the Report against Plaintiff, and more than four months after Plaintiff's complaint had been filed and left dormant.

122. Defendant Vincent's assessment records, without any observation as to conflict, that the Provost "recruited and hired Gopalan to UMES and considered Gopalan a friend," and adopts that Provost's statement that the chair's "conduct was consistent with Allen's expectations for a department chair."

123. The assessment concluded that the conduct complained of "falls squarely within her responsibilities as the department chair." It identifies no duty of a department chair that involves stalking outside a colleague's classroom. It made no inquiry of the chair's supervisor as to what her responsibilities were.

124. The assessment recharacterizes the five occasions alleged as "Banks physically checked on Gopalan while he was teaching on three dates in the Fall semester."

125. Defendant Vincent's assessment states that it "evaluated the complaint on its face and presumed the facts as alleged by Gopalan were true." It nonetheless went beyond the complaint to gather information from two individuals adverse to Plaintiff, and used what they supplied to dispose of it.

126. The disparity is as follows. Where Plaintiff was the respondent, TNG interviewed the complainant, interviewed four witnesses, offered Plaintiff six separate interview dates across two rounds, and devoted a full section of its Report to documenting each invitation. Where Plaintiff was the complainant, TNG interviewed neither him nor the respondent nor the respondent's supervisor, consulted two persons adverse to him, and disposed of the matter without an investigation.

127. Both determinations were made by the same firm, commissioned by the same office, in overlapping periods.

128. On information and belief, Defendants produced reports or assessments concerning at least two other members of the faculty of the same institution during the same period, each commissioned by the same office, and each resulting in an adverse outcome for a faculty member who had reported serious misconduct by UMES officials including its president, Ms. Heidi Anderson. Plaintiff's belief is founded upon the matters pleaded above and upon the fact that the identity and content of those engagements lie within Defendants' knowledge and not within Plaintiff's. Plaintiff will identify each such engagement upon discovery.

**N. The complaint lay dormant for eight months, and the division of the matter into two proceedings operated in one direction only**

129. The retaliation complaint was not delivered to a distant office. It was submitted on February 14, 2025, in a meeting with Witness 1 and Witness 2 — the lead investigator and co-investigator then conducting the open investigation of the initial complaint against Plaintiff.

130. Witness 1's recorded testimony is that she advised the complainant at that meeting that the conduct "reasonably could constitute retaliation if proven true," and that she had "the option to file a complaint related to the retaliation incident, which is separate from the initial complaint." The complainant filed it that day.

131. Witness 3 was informed of the ICE agents' attendance by the University's General Counsel on or about the same date, and his recorded testimony is that he directed Witness 1 and Witness 2 to meet the complainant.

132. The office therefore had, on February 14, 2025: knowledge of the ICE agents' attendance; the General Counsel's account of what the agents had said; a written retaliation complaint; and an open investigation of the same respondent, staffed by the same investigators, which would not conclude until June 2, 2025.

133. The Policy required prompt action. It provides that where "the University knows (or reasonably should know) of possible Discrimination, it will take **prompt and appropriate action** . . . to investigate or otherwise determine what occurred," and that "[t]his obligation applies to Discrimination covered by this Policy and Procedure, regardless of where the Discrimination allegedly occurred, **whether a parallel law enforcement investigation or action is pending**, or whether a written complaint/report is filed."

134. The Policy further provides that "[u]pon receiving an initial report or complaint, OIE will assess whether an Investigation is justified," and that the University "endeavors to resolve complaints of Discrimination within ninety (90) days."

135. Nothing was done. No notice was issued to Plaintiff. No investigation was opened. No assessment appears in any document produced to Plaintiff. The ninety-day period expired in or about May 2025 without any step having been taken.

136. During the eight months in which the complaint lay dormant, the following occurred: the initial investigation was completed and a finding issued against Plaintiff on June 2, 2025; Plaintiff appealed on June 9, 2025; his appeal was denied on July 25, 2025; he was demoted on July 27, 2025; and on September 22, 2025 he submitted to the University System of

Maryland a complaint concerning the President of the institution, which the Chair of the Board of Regents acknowledged the same day.

137. Seventeen days after that last event, and two hundred and thirty-seven days after the complaint was received, the Notice of Investigation issued.

138. The delay was not neutral in its effect. Plaintiff prosecuted his appeal in the initial matter in June and July 2025 without knowing that a further complaint against him had been pending since February. Defendants then quoted that appeal submission at length in the Report and relied upon statements within it. In particular, the Report's causation analysis states: "According to Respondent's statements in his appeal submission, Respondent thought Complainant's contract was set to expire on February 19, 2025." A statement Plaintiff made in one proceeding, in ignorance of the second, was thus converted into evidence against him in the second.

139. The delay also destroyed the possibility of establishing the fact on which the whole matter turned. On February 14, 2025 the agents' visit was hours old, the General Counsel had their card, and any record of the report to the federal agency was current. Defendants began work in October 2025 and recorded that they could not determine when the report had been made. Witness 2's recorded testimony is that she "was not aware of any evidence regarding whether Respondent submitted his report to ICE prior to December 6, 2024." That question was answerable in February 2025. It was not answerable when Defendants took it up, and Defendants resolved it by presumption instead.

140. The appeal officer subsequently measured compliance with the ninety-day standard from the Notice of Investigation of October 9, 2025 rather than from the complaint of February 14, 2025, and treated the standard as one of business rather than calendar days. On either measure the interval from the complaint to the finalization of the Report was three hundred and seventy-seven days.

141. The consequence of the delay was that a single course of events was divided into two proceedings, and the second was conducted on the footing that the first had settled matters the first had never fairly determined.

142. The second proceeding did not confine itself to the act alleged. It reopened and re-examined the subject matter of the first. The Report devotes some five pages to re-narrating the initial complaint, quotes Plaintiff's appeal submission in the initial matter at length, and reproduces the findings made in the initial investigation report. Defendant Starnes asked Witness 1 "whether the investigation of the Initial Complaint considered whether Complainant had engaged in fraudulent activity in completing her timesheets," and Witness 1 "confirmed that this was part of the investigation of the Initial Complaint."

143. Having reopened it, Defendants then treated the first proceeding's conclusions as settling the question against Plaintiff. The Report's pretext analysis states: "Further, although Respondent raised the same reasons in his appeal of the Initial Complaint, the Appeal Decision-maker found that Respondent offered no new evidence to support his reasons and found insufficient evidence in the Initial Complaint to support Respondent's reasons," and then quotes that earlier decision. The outcome of the first proceeding was thus used as a reason to reject Plaintiff's defense in the second.

144. The appeal officer in the second proceeding acknowledged that this had occurred. Her decision records, at footnote 13: "The Appeals Officer notes that as part of the Retaliation Investigation, the Investigator did review evidence related to the underlying accusations the Appellant/Respondent made toward the Complainant."

145. Yet every argument Plaintiff advanced touching that same subject matter was refused as untimely. The appeal decision so holds in respect of his arguments on notice ("the time period for appeal in the Initial Investigation has already passed"); on jurisdiction ("some of his argument applies to the Initial Investigation . . . which would render those portions of his argument as untimely and therefore denied"); on access to evidence ("some of the Appellant's arguments discuss evidence that was relevant to the Initial Investigation . . . and that such arguments are therefore not timely"); on timelines; and on institutional bias ("[t]o the extent that the Appellant's assertions relate to the Initial Investigation . . . those arguments are untimely").

146. The refusal extended to the witness. The appeal decision records, at footnote 10: "To the extent the Appellant seeks to describe here witnesses who were participants in the Initial

Investigation, including a witness who could testify that the Respondent had never met with the Complainant alone; such an argument would be denied for being untimely."

147. The subject matter of the first proceeding was therefore available to Defendants and closed to Plaintiff. Defendants imported the earlier findings, relied upon the earlier appeal outcome, and re-examined the earlier evidence; Plaintiff's attempts to address the same material, and to identify the witness who could have answered it, were excluded from consideration as out of time.

148. That asymmetry was the product of Defendants' own conduct. Had the complaint been acted upon when it was received on February 14, 2025, as the Policy required, it would necessarily have been determined alongside or within the investigation then open against Plaintiff, in a single proceeding in which the timekeeping and performance questions, the identified eyewitness, and the retaliation allegation would all have been before the same decision-maker at the same time. By retaining the complaint for two hundred and thirty-seven days, Defendants and the office that engaged them brought about a division of the matter that operated in one direction only.

149. Plaintiff avers that a firm holding itself out as a national specialist in the conduct of institutional investigations knew, or was reckless in not knowing, that a second proceeding conducted upon substantially the subject matter of a concluded first proceeding, in which the earlier conclusions are treated as established and the respondent's challenges to them are excluded as untimely, is not the impartial process it had represented it would provide but unlawful retaliation against a whistleblower.

**O. The official Plaintiff had complained about occupied every role in both determinations**

150. The sexual-assault accused UMES Assistant Vice President for Institutional Equity, Diversity, and Compliance, who is also designated the University's Title IX Coordinator, EEO Fair Practices Officer and ADA Coordinator, is the official against whom Plaintiff had made complaints to the University System of Maryland, to UMES Human Resources, to the Office of the Attorney General of Maryland and to federal agencies, beginning in December 2024. He is a named defendant in litigation commenced by Plaintiff. He is the named contact on the published Policy and Procedures.

151. That official occupied, simultaneously and without disclosure by Defendants, each of the following positions in the matters described in this Complaint.

152. **He headed the commissioning office.** The Policy records that the President's delegation of authority to implement it runs to his office. His office selected Defendants, retained them, paid them and determined their scope of work.

153. **He was a fact witness against Plaintiff.** He is recorded in the Report as "Witness 3." Defendant Starnes interviewed him on November 18, 2025 and relied upon his account of the December 6, 2024 meeting and of the ICE agents' attendance.

154. **He was the gatekeeper of the documentary evidence.** The Report records that on December 19, 2025 Defendant Starnes contacted him to request his office's help in obtaining the complainant's timesheets, and that she received them on January 7, 2026. The Report further records: "Per Investigator Starnes' request, Witness 3 requested and subsequently provided Investigator Starnes with the following information from HR. Witness 3 also provided Investigator Starnes with correspondence between OIE and HR during the investigation of the Initial Complaint." Defendants thus obtained the documentary evidence against Plaintiff from, and only from, a witness in the same investigation whom Plaintiff had accused of misconduct.

155. **He framed the inquiry on which the pretext finding turned.** The correspondence he supplied includes his own email to the Director of Human Resources of March 27, 2025 asking whether Plaintiff "has submitted or filed any complaints regarding timesheet fraud prior to December 6, 2024." His own interview testimony places Plaintiff's report of those concerns to him on December 6, 2024. The inquiry he framed and supplied was drawn so as to exclude the date his own testimony identified.

156. **His two direct reports were the other institutional witnesses.** Witness 1 and Witness 2 are, respectively, the Assistant Director and the Associate Director of his office. The Report's credibility section states that his testimony "was corroborated by applicable testimony from Witness 1, Witness 2, Witness 4, and Complainant." Defendants treated agreement

between a supervisor and his two subordinates as corroboration, and disclosed neither the reporting relationship nor the conflict.

157. **He received both of Defendants' determinations.** The sanctions memorandum of April 23, 2026 is addressed to him by name. So is Defendant Vincent's assessment of July 29, 2026 disposing of Plaintiff's own complaint.

158. **He supplied an aggravating fact used against Plaintiff in sanctioning.** Defendant Harris records at footnote 3 of her memorandum: "Per the Assistant Vice President for Institutional Equity, Diversity, and Compliance, to date, Respondent has not completed any of his assigned trainings."

159. **He scoped Plaintiff's own complaint and determined its jurisdiction.** Defendant Vincent's assessment records that "Jason Casares, the UMES Title IX Coordinator, determined that Gopalan's complaint potentially implicated UMES' prohibition of bullying, harassment, and stalking," and that "The Assistant Vice President for Institutional Equity, Diversity, and Compliance determined that the jurisdictional elements were met."

160. **Defendants designated him as the channel for Plaintiff's own retaliation concerns.** TNG's letter of October 28, 2025 instructed Plaintiff: "If you believe you're being retaliated against, please contact the Title IX Coordinator immediately at jacasares@umes.edu," and directed any request for accommodation to the same address.

161. Defendants disclosed none of the foregoing in the Report, in the sanctions memorandum, or in the assessment. The Report's credibility section describes the witnesses as "generally credible" and identifies no interest, conflict, reporting relationship or stake on the part of any of them – a brazen falsehood.

162. Plaintiff avers that no impartial investigator, and no investigator holding itself out as a national specialist in the conduct of such investigations, could have accepted that configuration of roles without disclosure, and that Defendants' failure to disclose it is evidence that the impartiality they represented was not provided. No impartial investigator could fail to see the clear and convincing evidence of retaliation.

**P. Defendants wrote the standards they departed from, and their principal has stated the governing principle repeatedly in public and once under oath**

163. Defendant TNG manages the Association of Title IX Administrators, which trains and certifies investigators and coordinators for institutional equity offices. On information and belief, the certification held by the UMES Assistant Vice President for Institutional Equity, Diversity, and Compliance — the official described in the preceding section — was issued by that association. TNG's consultants are the faculty who deliver that training.

164. The training course titled "Investigation Skills and Report Writing for Higher Education," bearing TNG's telephone number and email address, sets out the standards TNG teaches investigators to observe. It is publicly available because federal regulation requires institutions to post the training materials on which their personnel are trained.

165. On information and belief, those standards include the following. Investigations are to be prompt, fair, thorough, reliable, impartial, equitable and independent, and the investigator, not the parties, is responsible for gathering the evidence. Investigators must document every effort to obtain evidence and explain any information not obtained. The investigation timeline must note any delay and its rationale. Credibility is a function of corroboration and consistency. Among the credibility errors investigators are trained to avoid are presumptions of responsibility, anchoring, confirmation bias, and accepting information at face value. Investigators are taught to write in a neutral register, avoiding conclusory words and bias language. As to party review of a draft report, the investigator is to follow up on all areas identified by the parties, to track the changes made, and to include the investigator's response to the party's comment, with rationales, as an appendix.

166. On information and belief, those standards further provide that the investigator should indicate where the decision-maker should focus without rendering conclusions or making findings on credibility; that the association does not recommend that investigators make conclusions; that any recommended finding must state that it is not binding on the decision-maker; and that the report's conclusion should state that it is not intended to draw conclusions regarding the accuracy of the allegations or the credibility of the parties. The

training separates the investigator, who gathers and summarizes, from the decision-maker, who decides.

167. Measured against the standards Defendants themselves teach, their work in Plaintiff's matter departed as follows. They listed a federal agency among their sources and obtained nothing from it, recording no effort and no explanation. They did not contact the witness identified to the institution in writing, and recorded no explanation. They recorded no rationale for a delay of two hundred and thirty-seven days before the investigation began or for the interval thereafter. They found Plaintiff less credible for want of corroboration they had declined to obtain. They accepted at face value a hedged, third-hand account of what federal agents had said. They resolved the decisive element by presumption. And they made a full credibility determination and a determination of responsibility, stating no reservation that either was non-binding and no statement that the Report drew no conclusion as to credibility. And they repeatedly violated every element of due process.

168. Defendant TNG's founder and chair has published his expectations concerning the outcomes of complaint processes. On information and belief, in a piece addressed to institutions and published on the association's website on February 29, 2024, he stated that for most of the firm's clients the norm is that sixty percent of complaints are not sustained and forty percent are; that an institution sustaining more than half of its complaints should be regarded as an outlier; that the more likely explanation for such a ratio is biased decision-making in favor of complainants; that an institution skewing higher in upholding complaints may need to address that remedially; and that an institution unable to find an internal solution should consider engaging the decision-makers of TNG's FAIR Center to mitigate the bias.

169. Plaintiff's matter was administered through the FAIR Center. Every item of correspondence he received from Defendant TNG bears the signature block "Resolution Officer, FAIR Center."

170. On information and belief, TNG's founder has also addressed the model in which the investigator makes the final determination. In a publication dated March 4, 2024 he defined that model as a practice in which one individual investigates the allegations and the same person makes the final determination of whether policy was violated; acknowledged that it

is criticized on the ground that it produces more biased and less accurate outcomes than models involving more rigorous process; and noted that federal regulations governing Title IX proceedings had for that reason required a decision-maker who was not the investigator. Defendant Starnes investigated Plaintiff, assessed his credibility, and determined that he was responsible.

171. TNG's founder has also published his view of procedural protections for respondents, over his own byline, in a national higher-education publication on January 15, 2020. Writing as president of the association Defendants operate, in advance of federal regulations that would require live hearings and cross-examination in campus proceedings, he stated that about twenty to twenty-five percent of the regulations were "potentially very detrimental" and that institutions "will need to work within those requirements, challenge them in court or find clever work-arounds." In the same piece he described cross-examination and live hearings as "potentially very detrimental to the cause of sex and gender equity in education." Defendants knowingly violated due process protections.

172. Plaintiff pleads that publication as Defendants' own account, through their principal, of their posture toward the procedural protections whose absence is complained of in this action. A firm whose founder publicly counsels institutions to find work-arounds to protections for respondents that it regards as detrimental, and which is then engaged by an institution to investigate a respondent, is not in a position to represent that the investigation it conducts affords the respondent an impartial process — least of all where, as here, the respondent demanded the very protection the founder had identified as the one to be worked around, and was refused. This pretextual investigation matched Defendants' goal to deliver retaliation and retribution on behalf of officials accused of fraud.

173. On information and belief, in a signed publication dated October 30, 2017, TNG's founder defended the procedural adequacy of campus resolution processes and identified the protections that make them adequate: that documents are shared with the parties and the report is shown to them before it is finalized, which he described as a major procedural protection; that the process operates under a presumption of innocence; that evidence is required to be relevant and credible; and that appeals are permitted. In Plaintiff's matter the first was afforded in three business days and without the underlying evidence; the second

was recited at page 4 of the Report and nowhere applied; the third was displaced by presumption; and the fourth was routed through Defendants themselves to a person whose identity they declined to disclose.

174. On information and belief, TNG's founder has stated the governing principle under oath. Retained as an expert witness on behalf of a student disciplined by a Massachusetts college, he testified that a conflict of interest arises where institutional officials control a process that is required to be impartial, because the interests of the institution and the interests of those operating the impartial process are not co-extensive; that it was improper for the institution's general counsel to perform a role assigned to the coordinator of that process; and that an appellate officer who steers the outcome of a proceeding acts improperly.

175. Each of those propositions describes Plaintiff's matter. The office whose head Plaintiff had complained of determined the scope, supplied the evidence and received both determinations. The institution's General Counsel — himself a person against whom Plaintiff had brought proceedings — was the sole source of the attribution on which the entire case rested. And the appeal was received, held and transmitted by the firm whose findings were under appeal.

176. Plaintiff pleads these matters as the measure of the care a professional in Defendants' position exercises; as evidence that the departures were knowing rather than inadvertent; and as evidence that the Report was not the product of the impartial process Defendants represented. Defendants wrote the standard. They teach it. They certify others in it. They did not apply it to Plaintiff because they wanted to aid retaliation against a whistleblower.

**Q. The governing Policy, the limits of the delegation, and Defendants' departures from both**

177. The conduct of which Plaintiff was found responsible is governed by the UMES Policy Prohibiting Discrimination and the Procedures Prohibiting Discrimination annexed to it, a published document of the institution available on the University's policy website.

178. The Policy records the sole delegation of authority under it: "The University's President has delegated authority to implement this Policy to the Office of Institutional Equity and Compliance (OIE)." It names the Responsible Executive as the "Executive Director and

Fair Practices Officer, Office of Institutional Equity and Compliance" and the Responsible Office as OIE.

179. The authority of the University System of Maryland to delegate its powers is defined by statute. Section 12-104(k)(1) of the Education Article of the Maryland Code provides that the Board of Regents may delegate any part of its authority over the affairs of the University to the Chancellor or the presidents, or to advisory bodies established under Section 12-201. Defendants are none of those. Neither the Policy nor any provision of the Education Article authorizes OIE to sub-delegate to a private contractor the functions the Policy assigns to it by name.

180. The Policy distinguishes expressly between functions that may be performed by a designee and functions that may not. It defines an "Investigation" as an assessment of evidence "conducted by a University employee **or designee**," and it provides that appeals are heard by "The Executive Director of the Office of Institutional Equity and Compliance **or their designee**." It uses no such language for the functions described in the following paragraphs.

181. **The report.** The Policy provides: "OIE shall complete a draft written report of its Investigation." Defendant Starnes completed the report. OIE did not.

182. **The notice of findings.** The Policy provides that OIE "will then notify the parties and give them an opportunity to review it," and that "The office will then issue a notice of findings to both parties and to appropriate University administrators." The notice of findings was issued on April 23, 2026 by an employee of Defendant TNG, from a TNG email address, on TNG letterhead.

183. **Sanctions.** The Policy provides, with respect to faculty: "With respect to Faculty Respondents Parties, disciplinary action or corrective measures will be imposed by the appropriate supervisors, in consultation with the Office of the Provost, OIE, and other relevant administrators, as needed." The Policy contains no provision for a "Sanctions Decision-maker," and no provision for the assessment of sanctions by any person outside the institution. Defendant Harris does not cite the Policy as the source of her authority. She cites instead "the email sent to Respondent on February 26, 2026, designating me as the

Sanctions Decision-maker." Harris knew she possessed no authority but nonetheless acted as if she did in furtherance of a retaliatory objective.

184. **Appeals.** The Policy provides that a party "must submit a written statement of their intent to appeal and grounds within five (5) business days of the date of receipt of the notice of finding **to OIE at equity@umes.edu**," and that "All requests for appeals must be submitted in writing to OIE: i. Emailed to: equity@umes.edu; or ii. Mailed or hand-delivered to: Office of Institutional Equity and Compliance, Early Childhood Research Building, Suite 1129, Princess Anne, MD 21583."

185. The Policy thus specifies, by email address and by street address, the office to which an appeal must be sent. That is the same address from which the Notice of Investigation had issued to Plaintiff on October 9, 2025.

186. Defendants directed Plaintiff to submit his appeal instead to Defendant TNG. On April 23, 2026 TNG wrote that an appeal could be submitted "in writing to me at patience.bartunek@tngconsulting.com which will be forwarded to the appropriate appeal authority."

187. On April 30, 2026, Plaintiff asked Defendants in writing to identify the source of their authority to receive appeals: "Please reference the policy giving you the authority to take appeals." He also asked the to identify who would decide the appeal.

188. Defendants did not answer those questions. They replied only: "The appeal is not sent to the appeal officer until the other party has had the opportunity to respond and both are sent at the same time. Please send it to me as directed."

189. Defendants did not answer because the Policy confers no such authority. Defendants also know that secret appeals are unlawful. The Policy directs appeals to OIE at a specified address. Defendants substituted themselves for that office, retained control of the appeal, and declined to identify the person who would determine it until May 21, 2026.

190. **Defendants read the Policy.** On February 9, 2026, in transmitting the preliminary report, Defendant TNG wrote: "Per the Policy, 'the report should include a summary of the

allegations, evidence reviewed, and witness statements; findings of material facts and an analysis of those facts; and a finding whether a Policy violation occurred.'" That sentence appears in the Policy immediately after the sentence "OIE shall complete a draft written report of its Investigation." Defendants quoted the second sentence of that paragraph while acting contrary to the first.

191. **Departures from the express due process provisions.** The Policy provides, under the heading "Due Process Rights of the Parties," that the parties "are provided notice of the charges and evidence, the right to present information and identify witnesses relevant to their case, to take part in an impartial Investigation, and to appeal the findings and/or sanctions," and that "a party may have an Advisor present during meetings related to an investigation."

192. **Plaintiff was not provided any evidence.** He requested it and was refused, and no evidence file or witness transcript was produced to him at any stage.

193. Plaintiff's right to identify witnesses relevant to his case was rendered nugatory. The witness identified to the institution in writing on December 11 and December 12, 2024 was never contacted, and no explanation appears in the Report.

194. **The good faith requirement Defendants did not apply.** The Policy provides: "Reports or complaints of Discrimination must be made in good faith because they are so serious and have the potential to cause great harm if made without justification. Accordingly, it is a violation of the Policy and Procedure for an individual to make a complaint or report in bad faith or without justification."

195. From December 6, 2024 — the day he received notice — Plaintiff contended that the complaint against him had been made in bad faith and for an ulterior purpose. The Report resolves the first element of the offence, whether the complainant engaged in protected activity, in a single paragraph, on the stated basis that the parties do not dispute that she reported and filed. It nowhere considers the good faith requirement the Policy imposes, or Plaintiff's contention that it was not met.

196. **The resolution timeline.** The Policy provides that "The University endeavors to resolve complaints of Discrimination within ninety (90) days." The complaint was filed on February 14, 2025. The Report was finalized on February 26, 2026, three hundred and seventy-seven days later. Even measured from the Notice of Investigation of October 9, 2025, the interval is one hundred and forty days. The Policy speaks of days; it does not speak of business days.

197. Plaintiff avers that Defendants knew, or were reckless in not knowing, that the process they were conducting departed from the governing Policy in the respects set out above, and that they lacked authority to perform the functions the Policy assigns to a named office of the institution, and that they proceeded notwithstanding to aid and abet retaliation.

**R. Publication**

198. Defendants published the Report and the sanctions memorandum to persons other than Plaintiff. Both documents were transmitted on April 23, 2026 by TNG to Plaintiff and, as the transmitting letter states, to "appropriate UMES administrators."

199. Defendants published both documents to personnel of the UMES Office of Institutional Equity and Compliance, including the Assistant Vice President for Institutional Equity, Diversity, and Compliance, to whom the sanctions memorandum is addressed by name.

200. Defendants published the Report to the complainant in the underlying matter, the transmitting correspondence providing that appeal documents submitted by a party will be shared with the other party.

201. On information and belief, Defendants published both documents to further persons within UMES and the University System of Maryland, including officers with responsibility for personnel decisions affecting Plaintiff. Plaintiff's belief is founded upon the documents' own provision that the findings would be advanced into institutional review processes, and upon the fact that the identity of the recipients lies within Defendants' knowledge and not Plaintiff's. Plaintiff will identify each recipient upon discovery.

202. Defendants published knowing that the documents would be placed before decision-makers at UMES, that they would be acted upon, and that their findings would be recorded in relation to Plaintiff's employment and his tenured appointment.

**S. Harm**

203. The statements complained of impute to Plaintiff dishonesty, bad faith and serious misconduct in his profession and are defamatory per se.

204. As a direct and proximate result of Defendants' conduct, Plaintiff has been suspended from his position; has been made the subject of a recommendation that his tenure be revoked; has suffered injury to his professional reputation and to his standing in his department, his institution and his field; has suffered impairment of his professional prospects and future earning capacity; and has suffered humiliation and distress.

---

## IV. CAUSES OF ACTION

### COUNT I — DEFAMATION

*(Defendants TNG, Starnes and Harris)*

205. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

206. Defendants published the statements set out above, which are of and concerning Plaintiff and are defamatory in character.

207. The statements are false.

208. Recipients of the Report and of the sanctions memorandum understood the statements in their defamatory sense and understood them to refer to Plaintiff.

209. Defendants published the statements with knowledge of their falsity or with reckless disregard for whether they were true or false, and with malice, as evidenced by the matters pleaded at paragraphs 42 through 80 above and in particular by their publication of a finding on the causal element after recording in the same document that the evidence for it did not exist,

by Defendant Harris's assertion of an absence contradicted by testimony in the file she reviewed, and by their acceptance without disclosure of an evidentiary record assembled and supplied by a witness whom Plaintiff had accused of misconduct and who headed the office that retained them.

210. There is no conditional privilege here. Defendants published with malice, knowledge of falsity or reckless disregard for the truth; by failing to conduct the impartial inquiry they represented themselves to be conducting; by declining to obtain evidence identified to the institution in writing and available to them; by publishing findings unsupported by the record in their own possession, and by publishing despite having no verifiable evidence of wrongdoing by Plaintiff.

211. Plaintiff has suffered general and special harm as a result.

212. Defendants' conduct was outrageous and was undertaken with a subjective appreciation of the risk of harm to Plaintiff and in conscious disregard of it. Defendants knew Plaintiff was a whistleblower who alleged retaliation and that they had no authority to investigate him. Defendants quoted the paragraph of the Policy whose opening sentence assigns the completion of the report to a named office of the institution, while acting contrary to it; recorded in the same document that the evidence on the decisive element did not exist and resolved it by presumption; asserted an absence of evidence contradicted by testimony within the file they had reviewed; and accepted without disclosure an evidentiary record assembled by a witness in the same investigation whom Plaintiff had accused of misconduct. Plaintiff is accordingly entitled to punitive damages.

**COUNT II — DEFAMATION BY IMPLICATION**

*(Defendants TNG, Starnes and Harris)*

213. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

214. By the selection and omission of material within their control — including the omission of the identified eyewitness, the omission of the interested status of the witnesses they credited, and the omission of the testimony recording that Plaintiff had raised his concerns to the institution on the day he received notice — Defendants created a false and

defamatory impression of Plaintiff, namely that he had weaponized a federal law enforcement agency against a subordinate and had fabricated a justification for having done so.

215. Defendants intended or endorsed that implication and published it with knowledge of its falsity or reckless disregard for the truth.

**COUNT III — FALSE LIGHT INVASION OF PRIVACY**

*(Defendants TNG, Starnes and Harris)*

216. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

217. Defendants gave publicity to matters concerning Plaintiff that placed him before those who received the Report and the sanctions memorandum in a false light.

218. The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

219. Defendants had knowledge of, or acted in reckless disregard as to, the falsity of the matter published and the false light in which Plaintiff would be placed.

**COUNT IV — TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS**

*(All Defendants)*

220. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

221. At all material times Plaintiff was party to an existing employment relationship with UMES, including a tenured appointment.

222. Defendants were at all material times third parties to that relationship. They are a private consulting firm and individuals engaged by it, compensated by fee, and are not officers or employees of UMES, of the University System of Maryland or of the State of Maryland. To the extent Defendants contend they acted as agents of UMES within the scope of any agency, Plaintiff avers in the alternative that the conduct complained of fell outside the

scope of any agency, and outside any authority the Policy or the Education Article permits to be conferred, and was therefore not privileged.

223. Defendants knew they had no authority and knew that the findings they published would be acted upon in relation to it. Defendant Harris's memorandum states in terms that its function was to advance the matter into the faculty and administrative review processes governing tenured appointments despite not articulating any authority for her to do so,

224. Defendants acted purposefully and without privilege or justification in publishing findings unsupported by the record in their possession, on a causal element they had recorded they could not establish, having declined to obtain the corroborating evidence identified to the institution in writing, in documents they knew would be used to Plaintiff's detriment in that relationship despite manifest lack of authority.

225. Actual legal damage resulted to Plaintiff.

**COUNT V — INTENTIONAL MISREPRESENTATION**

*(Defendants TNG and Starnes)*

226. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

227. In its letter of October 28, 2025 and in the communications that followed it through November 12, 2025, TNG represented that it had been engaged to conduct an impartial investigation, that Plaintiff was a party to a regular institutional proceeding conducted according to policy, and that he was protected from retaliation within it.

228. Those representations were material to Plaintiff's decision to respond, to propose a date and to attend the meeting of November 12, 2025.

229. The representations were false when made, or were made with reckless disregard for whether they were true.

230. Defendants made the representations with the intention that Plaintiff rely upon them and participate.

231. Plaintiff justifiably relied upon the representations during the period from October 28, 2025 to November 12, 2025 and participated in reliance upon them, attending and providing information he would not otherwise have provided.

232. Plaintiff was injured as a proximate result.

**COUNT VI — CONCERTED TORTIOUS CONDUCT**

*(All Defendants)*

233. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

234. Defendants acted in concert with officials of UMES, who are not parties to this action, pursuant to a common design to produce adverse findings against Plaintiff and to generate the predicate for the termination of his tenured appointment because he filed complaints about serious organized fraud by them and exposed egregious plagiarism by UMES President Ms. Heidi Anderson.

235. In the alternative, Defendants knew that the conduct of those officials constituted a breach of duty to Plaintiff and gave substantial assistance and encouragement to that conduct by producing the Report, the sanctions memorandum, and the assessment described at paragraphs 84 through 97.

236. Plaintiff pleads this Count under Section 876 of the Restatement (Second) of Torts.

237. Plaintiff suffered harm as a proximate result.

**COUNT VII — CIVIL CONSPIRACY**

*(All Defendants)*

238. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

239. Defendants combined with officials of UMES, who are not parties to this action, with a common purpose to do an unlawful act, or a lawful act by unlawful means, namely to subject Plaintiff to adverse institutional findings and to the loss of his tenured appointment in retaliation for Plaintiff exposing serious organized fraud by them.

240. Overt acts done in furtherance of that purpose included: the retention of the retaliation complaint without action for two hundred and thirty-seven days by the same officials who were at the time investigating Plaintiff, and the issuance of notice of it seventeen days after Plaintiff's complaint of September 22, 2025 concerning the President of the institution; the engagement of Defendants for "resolution" of the allegations; the framing of the human resources inquiry so as to exclude the date on which Plaintiff was recorded as having raised his concerns; the supply of the documentary record by a witness in the same investigation whom Plaintiff had accused of misconduct; the reopening of the subject matter of the concluded first proceeding while Plaintiff's own arguments upon that subject matter were excluded as untimely; the refusal of all access to the evidence file and to the witness transcripts; the refusal of any opportunity to question adverse witnesses; the publication of a finding on a causal element Defendants had recorded they could not establish; the escalation of a single-occasion finding to a recommendation of termination proceedings; and the disparate treatment of Plaintiff's own complaint described at paragraphs 84 through 97.

241. Defendants acted with malice, that is with an intent to injure Plaintiff.

242. Defendants' conduct was not undertaken in furtherance of any legitimate business purpose. Defendants were engaged, and represented themselves, to conduct an impartial investigation. The conduct complained of was incapable of serving that purpose and was inconsistent with it.

243. Plaintiff avers that the consideration Defendants received cannot supply justification for the conduct complained of, that consideration being the price of the very acts alleged to be wrongful rather than evidence of an independent commercial interest lawfully pursued.

244. Actual legal damage resulted to Plaintiff.

245. Defendants acted with a subjective appreciation of the risk of harm to Plaintiff and in conscious disregard of it, and Plaintiff is entitled to punitive damages against each of them.

**COUNT VIII — TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS**

*(All Defendants)*

246. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

247. Plaintiff had a reasonable probability of prospective contractual relations, including continued employment on existing terms, the continuation of his tenured appointment, the administration of federally funded research, and professional opportunities within and beyond his institution.

248. Defendants acted purposefully to harm those prospective relations, without privilege or justification.

249. Actual legal damage resulted.

**COUNT IX — NEGLIGENCE**

*(All Defendants)*

250. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

251. Defendants undertook to conduct an impartial investigation concerning Plaintiff and knew that he was the person whose professional standing and tenured appointment would be affected by their findings.

252. Defendants owed Plaintiff a duty to exercise reasonable care in the conduct of that investigation and in the findings they published concerning him.

253. Defendants breached that duty, including by failing to obtain evidence identified to the institution in writing and available to them; by failing to examine records covering the period at issue; by resolving a causal element they had recorded they could not establish; by treating interested persons as neutral witnesses without disclosure; by obtaining the documentary evidence from a witness in the same investigation; by treating agreement between a supervisor and his two direct reports as corroboration; by weighing in aggravation prior findings that were then under challenge in a court of law and that the institution's own appeal officer would decline to revisit; by conducting a second proceeding upon substantially the subject matter of a concluded first proceeding, treating the earlier

conclusions as established while the respondent's challenges to them were excluded as untimely; by proceeding from a facially lawful act to a finding of responsibility without addressing whether the act was protected; by finding that the conduct lay outside Plaintiff's employment duties and reasoning from that finding that he had no legitimate reason for it; and by departing in each of the respects pleaded above from the standards Defendants themselves publish and teach to investigators; and by asserting an absence of evidence contradicted by testimony within their own file.

254. Plaintiff was harmed as a proximate result.

**COUNT X — DECLARATORY JUDGMENT**

*(All Defendants)*

255. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

256. An actual controversy exists between Plaintiff and Defendants as to whether Defendants conducted the impartial investigation they represented and were engaged to conduct, and as to the validity, as against Plaintiff, of the findings they have issued.

257. Plaintiff seeks a declaration, pursuant to the Declaratory Judgments Act, 42 Pa.C.S. § 7531 et seq., directed to the rights and obligations of the parties before this Court and to no others, that the findings issued by Defendants adjudicating Plaintiff responsible are of no effect as against him.

258. The declaration sought operates upon Defendants' own conduct and upon Plaintiff's rights as against them. It does not purport to determine the obligations of the University of Maryland Eastern Shore, to direct or restrain that institution, or to adjudicate the construction of its policies for any purpose other than the measurement of Defendants' conduct in this action.

259. The question is in any event bound up with Plaintiff's claims in tort. Whether Defendants had authority and conducted an impartial investigation bears directly upon the availability to them of any conditional privilege, upon whether their conduct was privileged or justified for the purposes of Counts IV and VIII, and upon the accuracy of the representations pleaded in Count V.

**COUNT XI — DECLARATORY JUDGMENT (WANT OF AUTHORITY)**

*(All Defendants)*

260. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

261. An actual controversy exists between Plaintiff and Defendants as to whether Defendants possessed authority to complete the investigative report, to issue the notice of findings, to receive and control the appeal, and to assess sanctions, under the UMES Policy Prohibiting Discrimination.

262. The Policy records that the President delegated authority to implement it to a named office of the institution. It assigns the completion of the report and the issuance of the notice of findings to that office; it directs appeals to that office at a specified email and street address; and it assigns the imposition of faculty discipline to the appropriate supervisors in consultation with the Provost and that office. The Policy permits a designee only where it says so, and it does not say so for any of those functions.

263. Section 12-104(k)(1) of the Education Article of the Maryland Code limits the persons and bodies to whom authority over the affairs of the University may be delegated. Defendants are none of them.

264. Plaintiff seeks a declaration, pursuant to the Declaratory Judgments Act, 42 Pa.C.S. § 7531 et seq., directed to the rights and obligations of the parties before this Court and to no others, that Defendants possessed no authority to perform those functions and that any finding or determination they issued in purported exercise of them is of no effect as against Plaintiff.

265. The declaration sought operates upon Defendants' own conduct and upon Plaintiff's rights as against them. It does not purport to determine the obligations of the University of Maryland Eastern Shore, to direct or restrain that institution, or to adjudicate the construction of its Policy for any purpose other than the measurement of Defendants' authority in this action.

266. The question is in any event bound up with Plaintiff's claims in tort, bearing directly upon the availability to Defendants of any conditional privilege and upon whether their conduct was privileged or justified for the purposes of Counts IV and VIII.

**COUNT XII — INJUNCTIVE RELIEF**

*(All Defendants)*

267. Plaintiff incorporates the foregoing paragraphs as though set forth at length.

268. Plaintiff has a clear right to relief for the reasons pleaded above.

269. The harm is immediate and irreparable and is not compensable in damages. Injury to reputation is an injury to an interest expressly protected by Article I, Section 1 of the Constitution of this Commonwealth, which numbers among the inherent rights of mankind those of acquiring, possessing and protecting property and reputation, and by Article I, Section 11, which provides that every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law.

270. A recorded finding that Plaintiff retaliated against a subordinate by reporting her to a federal immigration enforcement agency, together with a recommendation that his tenure be revoked in consequence, cannot be undone by an award of money. It attaches to his professional record, is available to any future review of his employment, and by its own terms is intended to support the termination of a tenured appointment.

271. Greater injury will result from refusing the relief than from granting it. Defendants have no legitimate interest in the continued publication of findings made in the manner pleaded above.

272. The relief sought is narrowly directed to the offending activity and will not adversely affect the public interest. Rather, the public interest favors the protection of a whistleblower who exposed fraud by public officials. Public interest requires the observance by paid external investigators of due process and constitutional protections.

273. Plaintiff accordingly seeks an order restraining Defendants from further publishing the Report and the sanctions memorandum pending final disposition of this action.

---

## V. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, and award:

(a) compensatory damages in an amount in excess of the jurisdictional limit for compulsory arbitration;

(b) damages for injury to reputation, humiliation and distress;

(c) punitive damages;

(d) costs of suit;

(e) pre-judgment and post-judgment interest;

(f) a declaration in the terms set out in Counts X and XI;

(g) preliminary and permanent injunctive relief in the terms set out in Count XII;

(h) an order directing Defendants to preserve all documents, communications, recordings, transcripts and electronically stored information relating to the engagement and to the investigations described herein, in native format with metadata intact, including without limitation the Evidence File referenced at pages 6 through 8 of the Report, the verified interview transcripts of each party and witness, the recordings from which those transcripts were prepared, the scope of work determined by the University, and all correspondence between Defendants and any officer or employee of UMES; and

(i) such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,

Sandeep Gopalan, *Plaintiff, pro se*

Dated: 9/22/2026

**VERIFICATION**

I, Sandeep Gopalan, verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Sandeep Gopalan. Dated: 9/22/2026

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Sandeep Gopalan, Plaintiff, pro se
Dated: 9/22/2026

**CERTIFICATE OF SERVICE**

I certify that on the date set forth below I caused a true and correct copy of the foregoing Complaint to be served upon each Defendant in the manner prescribed by Pa.R.C.P. 400 et seq.

Sandeep Gopalan. Dated: 9/22/2026